UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 284-1 |
| v. | |
| CHRISTOPHER HENDERSON | Judge Edmond E. Chang |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this position paper as to sentencing factors, and asks the Court to sentence defendant CHRISTOPHER HENDERSON to a term of imprisonment above the applicable Guidelines range of 57 to 71 months. As detailed below, a sentence of 100 to 120 months' imprisonment is warranted pursuant to 18 U.S.C. § 3553(a).

## I. FACTUAL BACKGROUND

Defendant trafficked hundreds of firearms to Chicago over the course of about two years. He intentionally sold these firearms to gang members, who were willing to pay top dollar for assault rifles and other weapons of war. Defendant's actions killed four people and wounded several others. As a result of his conduct, defendant was charged by indictment with willfully engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 2 (Count One), and interstate travel in furtherance of conduct constituting unlicensed dealing in firearms, in violation of 18 U.S.C. §§ 924(n) and 2 (Counts Four, Five, Six, Seven, and

Eight).  Dkt. No. 49.  On April 5, 2019, defendant pled guilty to Counts One, Four, and Five.  Dkt. No. 96.

Specifically, beginning no later than in or about July 2016, and continuing until on or about May 10, 2018, defendant and co-defendant John Phillips operated a firearms trafficking business.  Defendant and Phillips worked together to purchase hundreds of firearms in Kentucky for the purpose of re-selling the firearms to buyers in the Chicago area.  Because their Chicago gun customers could not (or did not want to) lawfully purchase firearms from a federally licensed firearms dealer, defendant and Phillips were able to charge 50% to 100% above the retail value of the firearms.  For instance, defendant generally charged around $700 for a Glock pistol, $750 for a Glock with an extended magazine, and $1,500 to $1,600 for larger guns, such as AR rifles and Dracos.[1]  Defendant and Phillips used "middlemen" like co-defendant Jaiqail Wright to assist them with finding buyers for the firearms.  They often used Facebook to send Wright and others photographs of the various weapons that they had for sale, along with the prices.

The breadth and extent of defendant's firearms trafficking operation is staggering.  He made numerous trips between Kentucky and Chicago over the course of two years.  The Facebook records show that, at times, he had arsenals of weapons for sale.  Defendant operated a full-service business, providing his customers with magazines and ammunition upon request.

---

[1] According to many of the Kentucky gun sellers that were interviewed, they typically sold Glocks to defendant for around $250 to $500, and larger rifles for around $500 to $650.

For example, on February 21, 2017, defendant received a Facebook message from "Jonathan," who stated that he was interested in buying whatever defendant had "on deck." Govt. Exh. B. In response, defendant sent Jonathan the below photograph of firearms that defendant had for sale.



During their negotiations, defendant and Jonathan discussed different combinations of guns that Jonathan could purchase for $4,000. Jonathan informed defendant that he wanted to purchase seven guns so that he could have "one for every day of [the] week." When Jonathan asked how many "sticks," or magazines, he would get, defendant responded that he did not have any but he could get some. After defendant and Jonathan met up to conduct the deal, Jonathan followed up with defendant to ask when defendant would have the "shells," or ammunition, for him. A few days

3

later, on February 27, 2017, defendant informed Jonathan that he purchased three boxes of ammunition for $50 per box. Jonathan responded that he thought the shells were free. Defendant stated that they are free "when I get em free," however, in this case defendant had to go to Walmart because he had not "been outta town."

Defendant's many Facebook conversations with Jaiqail Wright are similar.[2] For example, on May 5, 2017, defendant informed Wright that he had various weapons for sale, including a Draco rifle for $2,000 and AR rifles for $1,500 and $1,000. Govt. Exh. C. In negotiating the deal, defendant sent the below photograph to Wright, which depicts the rifles, along with a Glock firearm that had a drum attachment capable of holding fifty bullets. With respect to the Glock, defendant told Wright that he was willing to sell the Glock, the drum, and a magazine capable of holding thirty bullets in exchange for $1,300.



---

[2] Some of the Facebook conversations between defendant and Wright are summarized in the criminal complaint. *See* Dkt. No. 1 at 12-30.

Defendant's ability to barter away firearms that are capable of shooting *fifty* bullets at once is chilling. And these are just a few of the many conversations defendant had with Wright and other firearms customers during the course of his trafficking operation. To defendant, selling firearms on the street to the highest bidder was a means of making quick cash. However, to the victims of gun violence, defendant's crime was life altering.

As of June 2019, thirty-eight firearms purchased by defendant were recovered by various law enforcement agencies in the Chicago area. The guns that defendant purchased and illegally trafficked to Chicago were recovered from convicted felons (such as his accomplice, John Phillips) and other offenders who used the firearms in connection with various crimes such as vehicular hijackings and narcotics offenses. And, as discussed in more detail below, ballistics evidence shows that some of the guns that defendant purchased as part of his firearms trafficking operation were used to commit numerous violent crimes, including homicides and aggravated batteries and assaults.

## II. GUIDELINE CALCULATION

### A. Offense Level

The Probation Officer calculated defendant's offense level as follows:

| | |
|---|---|
| 12 | Base offense level (§ 2K2.1(a)(7)) |
| +8 | Offense involved at least 100 firearms (§ 2K2.1(b)(1)(D)) |
| +4 | Defendant engaged in the trafficking of firearms (§ 2K2.1(b)(5)) |
| +4 | Defendant possessed or transferred any firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense (§ 2K2.1(b)(6)(B)) |
| <u>-3</u> | <u>Acceptance of responsibility (§§ 3E1.1(a)-(b))</u> |
| 25 | Total offense level |

*See* PSR ¶¶ 19-30.

This offense level corresponds with the offense level anticipated by the government in defendant's plea agreement and the government's version of the offense. In particular, the government has met its burden of proving that (1) the offense involved at least 100 firearms, and (2) defendant transferred a firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.

### 1. Defendant Trafficked Approximately 346 Firearms

The evidence in this case shows that defendant is responsible for trafficking well over 100 firearms. In order to identify the firearms that are linked to defendant's trafficking business, law enforcement analyzed various categories of evidence. The evidence is summarized in Government Exhibit A, referred to herein as "the Henderson Chart." As set forth in the Henderson Chart, the categories of evidence include: (1) interviews of Kentucky residents who sold firearms to defendant;[3] (2) social media records; (3) emails from accounts used by defendant and Phillips; (4) phone records, including tolls and cell site data; (5) text messages and other content downloaded from phones used by defendant; (6) sales receipts; and (7) forms

---

[3] The Henderson Chart filed on the docket as Government Exhibit A does not contain the names of the various third-parties who sold firearms to defendant. The government will bring a copy of the Chart which contains the names of the sellers to the sentencing hearing.

completed by defendant during instances where he purchased firearms from federally licensed dealers.[4]

While law enforcement has been able to identify serial numbers for a portion of the firearms trafficked by defendant, there are many firearms that have not been identified by their unique serial number. As a result, it is possible that some of the 346 firearms accounted for in the Henderson Chart are "double counted." For this reason, the government is taking a more conservative position that defendant's offense involved over 100 firearms for purposes of calculating the Guidelines.

### 2. Defendant Knew That the Firearms Would Be Used or Possessed in Connection With Another Felony Offense

Guideline § 2K2.1(b)(6)(B) is applicable if the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." This subsection applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." Application Note 14(A). "Another felony offense" is defined as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." Application Note 14(C).

---

[4] Binders containing the Reports of Interview ("ROIs") and Facebook records cited in the Henderson Chart will be provided to the Court and defense counsel prior to the sentencing hearing, as these reports will be referenced by the government during its presentation.

In this case, defendant transferred firearms with knowledge, intent, or reason to believe that they would be used in connection with retaliatory shootings. Two examples are set forth in the government's version of the offense. First, on January 26, 2017, Wright used Facebook to contact defendant to see if he had any guns for sale. Govt. Exh. D. Defendant responded that he did not have anything. Wright replied, "When u gone be ready my Boi need Thaf (sic) shit to go slide we just lost one are niggas."[5] Defendant told Wright that he was out of town but would be ready to sell firearms to Wright the following day. On January 27, 2017, Wright followed up with defendant and stated that defendant "was about to get fired" because "they on my ass bout these poles [guns]." Defendant told Wright that "they," referring to the buyers, need to "chill" and then used Facebook to send Wright photographs of firearms. Over the next few days, defendant and Wright communicated about meeting up for the purpose of selling firearms and ammunition.

Similarly, on August 4, 2017, Wright used Facebook to contact defendant to inform him that "[w]e need them licks [guns]." Govt. Exh. E. Defendant responded, "U don't they do lol." Wright replied, "Mf got shot today. . . . Mfs rob dice game." Henderson then inquired where the shooting occurred, and asked "[o]ur shit or c nem [our dice game or the Conservative Vice Lords street gang?]" Wright responded, "On

---

[5] As stated in the government's version, Wright was likely referring to the death of an individual known as "Rondo Offdaave." At the time that Wright contacted defendant about getting guns from him, Wright also posted a public message on his Facebook account referring to the death of "Rondo Offdaave." A search of CPD records for homicide victims in January 2017 showed that Individual LL, a twenty-year-old male, was shot and killed on or about January 23, 2017. Individual LL was a documented member of the CCG faction of the Conservative Vice Lords street gang. Photographs of Individual LL match the photographs from the Facebook profile that Wright tagged in his "Rondo Offdaave" post.

CP one Are shorty pop one they ass," meaning that the shooting took place on Central Park Avenue and was committed by someone in Wright's crew. Defendant stated, "Dam they getting shit popping I see."[6] Over the next few days, defendant and Wright communicated about meeting up for the purpose of selling firearms. Specifically, on August 9, 2017, defendant told Wright that he would be able to meet Wright in the afternoon. Frustrated with defendant, Wright responded, "Dam shorty I just told them come get it in the morning they thirsty." Defendant wrote back later that day to confirm that "they," referring to the gun buyers, "wanted that drum and that glizzy with the beam [Glock with the laser attachment]."

Defendant and Wright continued to conduct gun deals after having these conversations about why Wright and his associates needed the guns. In their Facebook conversations, defendant and Wright made specific plans to meet up to conduct the deals—at times, even sharing their precise GPS coordinates.

In short, it is clear from the Facebook records that defendant transferred firearms to Wright and his associates with knowledge or reason to believe that they would be used to commit other felony offenses, such as shooting opposing gang members. As a result, § 2K2.1(b)(6)(B) applies. *See United States v. Rodriguez*, 884 F.3d 679, 680 (7th Cir. 2018); *United States v. Jemison*, 237 F.3d 911, 918 (7th Cir. 2001) (finding the sale of firearms to gang members supports this enhancement).

---

[6] As stated in the government's version, Wright was likely referring to a shooting that occurred on August 4, 2017, on the 900 block of North Central Park Avenue in Chicago. Specifically, responding officers located the victim, Individual MM, with a gunshot wound to his upper right arm. Individual MM told the officers that he was walking past a group of unknown individuals who were rolling dice on the sidewalk. As Individual MM passed the group, he was robbed and then shot in the arm as he tried to flee the area.

### B. Criminal History

The PSR includes a misdemeanor conviction that was not referenced in defendant's plea agreement. Specifically, on December 16, 2013, defendant was convicted of retail theft and sentenced to court supervision and community service. PSR ¶ 37. The government agrees that one criminal history point should be attributed to this prior conviction. Defendant's criminal history category is I, which is the same category contemplated in the plea agreement.

### C. Advisory Guidelines Range

With an offense level of 25 and criminal history category of I, defendant's advisory Guidelines range is 57 to 71 months' imprisonment. PSR ¶ 84. The government agrees that this is the correct advisory Guidelines range. The government does not have any objections to the PSR.

## III. APPLICATION OF THE SENTENCING FACTORS

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the sentence to impose, the court must consider the statutory factors listed in § 3553(a)(1)-(7).[7] One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of

---

[7] Those are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the statutory sentencing factors reveals that a sentence of 100 to 120 months, which is 43 to 49 months above the Guideline range, is warranted.

### A.     The Seriousness and Nature and Circumstances of the Offense

The seriousness of defendant's crime is best captured by the NIBIN reports. The National Integrated Ballistic Information Network, commonly referred to as "NIBIN," provides investigators the ability to compare their ballistics evidence against evidence from other violent crimes on a national, regional and local level. In this case, ballistics comparisons linked at least eight firearms purchased by defendant to multiple shootings in the Chicago area, including four homicides.[8]

For example, on July 1, 2016, defendant purchased a Kahr Arms, model CT40, .40 caliber pistol, bearing serial number AAA0390, from a Kentucky resident. During an interview with law enforcement, the seller stated that he sold the pistol, holster, and a box of ammunition to an individual that matched defendant's general description. He also provided a receipt documenting the sale of the Kahr Arms pistol to defendant in exchange for $450. On July 22, 2016—just a few weeks after defendant purchased the firearm—it was used in a shoot-out between two groups of

---

[8] At this time, at least one family member of one of the homicide victims has expressed an interest in providing a victim impact statement to the Court and/or making a statement to the Court during the sentencing hearing. Prior to the sentencing hearing, the government will provide copies of any victim impact statements received to the Court and defense counsel, and/or the names of individuals who wish to speak at the hearing.

11

people on the 3000 block of West Fulton Street in Chicago. Then, about two weeks later, Chicago police officers working in the 11th District recovered the Kahr Arms from a nineteen-year-old male who ran from the officers while carrying the loaded firearm in his front pocket.

On July 8, 2016, defendant purchased a Smith and Wesson, model SD9VE, 9 millimeter pistol, bearing serial number FXX0684, from a federally licensed firearms dealer located in Louisville, Kentucky. Approximately one month after defendant purchased the Smith and Wesson, it was used to commit a homicide on August 10, 2016, in the area of 200 South Oakley Boulevard in Chicago.[9] Two days after that murder, the Smith and Wesson was used to commit another murder on the 400 block of North Lavergne Avenue in Chicago. Eventually, the Smith and Wesson made its way to a twenty-year-old male who Chicago police officers recognized as a known gang member. Specifically, as documented in the arrest report, on February 21, 2017, Chicago police officers observed the male pull the Smith and Wesson from his waistband as he fled from the police. The male then threw the gun off the porch of residence and into a vacant lot. The police recovered the gun and discovered that it was fully loaded. During a post-Miranda interview, the male stated that he was carrying the gun for protection due to an ongoing gang conflict in his neighborhood.

---

[9] The government is in the process of compiling the police reports from the homicides referenced in this memorandum and will be in a position to provide more details regarding these murders at the sentencing hearing. Of course, once the reports are received from law enforcement, they will be made available to defense counsel as well.

On October 15, 2017, defendant purchased a Taurus, model 709, 9 millimeter pistol, bearing serial number TKM61888, from a Kentucky resident. During an interview with law enforcement, the seller stated that he sold the gun to an individual that matched defendant's general description. The seller provided emails showing that, prior to the deal, he corresponded with an email address used by defendant. After defendant purchased the Taurus, it was used in a string of crimes beginning in February 2018. Specifically, on February 16, 2018, the Taurus was used to shoot a twenty-three year old male in the left buttocks while he was playing dice. On May 1, 2018, the Taurus was used in a shooting that left two individuals wounded. On May 12, 2018, the Taurus was used to shoot a fifteen-year-old male in the left arm and torso. On May 17, 2018, the Taurus was used to shoot a forty-three year old male. According to the police report, a woman and her three young children were also present on the street when this particular shooting took place.[10] Finally, on June 3, 2018, Chicago police officers recovered the Taurus from a nineteen-year-old male after a brief foot chase; the male had a prior felony conviction for unlawful possession of a firearm and was on parole at the time he possessed the Taurus. According to the police report, the male told the officers that he was carrying the firearm for protection because he had previously been shot in the leg.

---

[10] Specifically, the woman told police that she observed two black males both displaying handguns and shooting towards them from across the street. "She had thought they struck one of her three children that were out with her in the front. She saw her three kids fall to the ground and began to run towards the shooters standing in the gang way across the street."

The above examples demonstrate that defendant's crime had real victims. Unfortunately, due to the volume of guns trafficked by defendant, there are sure to be many more victims in the future. To be clear, the government does not have any information indicating that defendant was personally responsible for any of the shootings referenced in this memo. Defendant was the person responsible for purchasing the firearms that were used in these acts of violence. By operating an open-air market for firearms in Chicago, defendant caused irreparable harm to the people of this city. The seriousness of defendant's offense cannot be understated. It is a factor that weighs strongly in favor of an above Guidelines sentence in this case.

**B. Defendant's History and Characteristics**

The government anticipates that defendant will argue that his lack of criminal history weighs in favor of a sentence of imprisonment either below or within the advisory Guidelines range. The government disagrees. Rather, it is the government's position that the defendant used his lack of criminal history to further his firearms trafficking operation.

For instance, there were multiple occasions where defendant purchased firearms from federally licensed firearms dealers and, in doing so, underwent a background check and made misrepresentations on the ATF Form 4473. Specifically, defendant falsely stated on the forms that the guns he purchased were for him— when, in fact, his true intention was to purchase the guns in order to re-sell to others for a profit. Defendant's lack of a criminal history was one of the tools he used to make this crime possible. For example, on July 8, 2016, defendant purchased the

14

below Masterpiece Arms 9 millimeter firearm bearing serial number FJ01232, from a licensed gun dealer in Louisville, Kentucky.



One day later—on July 9, 2016—Phillips (a convicted felon who cannot purchase firearms from licensed gun dealers) used Facebook to send defendant the above photograph of the same Masterpiece pistol with the yellow price tag affixed to it. According to the tag, the "street price" for the pistol and extended magazine was $1,700.[11]

Defendant also used his non-felon status to purchase ammunition for his firearms customers. As discussed above, defendant made a special trip to Walmart

---

[11] The market rate for this type of gun is below $1,000.

to make sure that "Jonathan" had ammunition for the firearm that defendant sold him.

The government also points out that the anticipated Guidelines calculations for defendant's co-defendants, Wright and Phillips, are much higher due to the fact that they have prior felony convictions that trigger higher base offense levels of 20 and 22, respectively. *See* Guideline §§ 2K2.1(a)(3)-(4). In contrast, despite the fact that defendant trafficked many semiautomatic firearms that are "capable of accepting a large capacity magazine,"[12] his base offense level of 12 is much lower because he does not have a qualifying prior conviction. In a firearms trafficking case like this, where the defendant used his lack of criminal history to enable his crime, the Guidelines do not fully account for defendant's conduct. Defendant was just as culpable as Phillips, and more culpable than Wright (who, like Henderson, likely has criminal history category I). For all of these reasons, an above Guidelines sentence is warranted.

### C. The Need to Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public from the Defendant

During the time that defendant committed the underlying firearms offenses in this case, he was on bond for a gun case pending in Cook County Circuit Court. Specifically, on October 11, 2016, officers from the Cicero Police Department

---

[12] As defined in Application Note 2 to § 2K2.1, "a 'semiautomatic firearm that is capable of accepting a large capacity magazine' means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm."

16

conducted a traffic stop of defendant's Mercedes Benz vehicle and identified defendant as the driver and sole passenger in the vehicle. After learning that defendant's driver's license was suspended, the officers arrested defendant and performed an inventory search of the vehicle. Inside a hidden trap compartment under the front passenger floorboard, officers found a loaded Glock, model 23, .40 caliber handgun bearing serial number ZBH639, with an extended 22 round magazine. The Cook County State's Attorney's Office charged defendant with aggravated unlawful use of a weapon, and he was released on bond.

Instead of abiding by the law at a time when defendant should have been on his best behavior, defendant chose to repeatedly violate the law by conducting numerous illegal gun transactions while on bond. Then, once defendant was arrested in the instant case, he showed that his lack of respect for the law was not limited to the state court system.

First, defendant lied to the U.S. Pretrial Services Officer who was working on behalf of the court to collect accurate information about defendant. Some of the most important information about a defendant seeking bond relates to his or her place of residence. Defendant falsely told the Officer that he lived in Chicago. In reality, defendant was living and working in Louisville, Kentucky, and had signed a lease for an apartment with his girlfriend and child in Louisville in October 2017.

Second, at the conclusion of defendant's pretrial detention proceedings, Magistrate Judge Valdez ordered that defendant remain in custody during the pendency of this case. Unhappy with the court's order, defendant shouted profanities

at the judge and actively resisted the United States Marshals who were attempting to manage the dangerous situation. *See* Govt. Exh. F at 20-21 (Detention Hearing Transcript); *see also* Dkt. No. 42 ("At the conclusion of the detention hearing, the Defendant had a verbal outburst laden with profanity. The Court warned defense counsel that any further outburst would be considered a contempt of court.").

Defendant's behavior while on bond for his state gun case and during the pendency of his federal case demonstrates that he has a serious lack of respect for the law and the court system. A significant term of imprisonment is warranted to show defendant that his flagrant disregard of the law will not be tolerated.

Similarly, defendant's prior gun arrest and charges from July 2016 did not deter defendant from committing additional serious criminal offenses. To the contrary, despite the fact that defendant faced criminal charges for illegally storing a loaded firearm in the floorboard of his vehicle, defendant continued to use vehicles to unlawfully transport firearms from Kentucky to Chicago. Defendant's criminal conduct occurred for approximately one and one-half years while his state case was pending. The need for adequate deterrence weighs strongly in favor of imposing a sentence of 100 to 120 months' imprisonment in this case.

It is equally important that defendant's sentence reflect the need for general deterrence as well. The Court is well aware that gun violence plagues the City of Chicago, and has been for years. Defendant served as a key supplier of firearms and, in doing so, he directly fueled the violence epidemic. Driven by greed, defendant saw an opportunity to profit off of the gang warfare. *See* Govt. Exh. G. As demonstrated

by the Facebook messages, there is a high demand for firearms in Chicago, and felons and other prohibited individuals are willing to pay top dollar for weapons. As a result, gun traffickers like defendant stand to make hundreds of thousands of dollars through unlawful gun sales. An above-Guidelines sentence will send the message that individuals who choose to traffic firearms to our city will be severely punished. Such a sentence will make potential gun traffickers think twice before participating in the illegal sale of firearms.

## IV. SUPERVISED RELEASE CONDITIONS

The government requests that the Court impose a term of supervised release of three years. The government further requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d) and Guideline § 5D1.3(a):

- Not commit another federal, state or local offense.

- Not unlawfully possess a controlled substance.

- Cooperate with the collection of a DNA sample if the collection is authorized by law.

The government further recommends the following conditions because they serve to facilitate supervision by the probation officer, support defendant's rehabilitation and reintegration into the community, and promote deterrence and protect the public:

- Provide financial support to dependents if financially able.

- Seek and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment.

19

- Refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity.

- Refrain from excessive use of alcohol or any use of a narcotic drug or other controlled substance, without a prescription from a licensed medical practitioner.

- Refrain from possessing a firearm, destructive device, or dangerous weapon.

- Participate, at the direction of a probation officer, in a mental health treatment program, which may include the use of prescription medications.

- Remain within the jurisdiction where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

- Report to a probation officer as directed by the Court or a probation officer.

- Permit a probation officer to visit the defendant at any reasonable time at home, at work, at school, at a community service location, and other reasonable location specified by a probation officer, and permit confiscation of any contraband observed in plain view of the probation officer.

- Notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent conditional or other legal privilege, answer inquiries by probation officer.

- Notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

In light of the ongoing need to support defendant's rehabilitation and reintegration into the community, protect the public, promote deterrence, and ensure that the probation officer can satisfy his or her duty to remain informed about the defendant, the government requests that the Court impose the following special conditions of supervision. These conditions do not involve a deprivation of liberty greater than reasonably necessary to achieve the statutory goals of supervision:

- If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours

of community service per week at the direction of the U.S. Probation Office until gainfully employed, with the amount of community service not exceeding 200 hours.

- Notify the court of any material change in the defendant's economic circumstances that might affect his ability to pay restitution, fines, or special assessments.

- Provide documentation to the IRS and pay taxes as required by law.

- Not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

## V.    CONCLUSION

In this case, an above-Guidelines sentence is necessary and just.  A sentence of 100 to 120 months' imprisonment will reflect the seriousness of defendant's crimes, deter the defendant and others from trafficking firearms in order to line their pockets, and protect the public from future crimes by the defendant.


Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Elizabeth R. Pozolo*
ELIZABETH R. POZOLO
KALIA COLEMAN
Assistant United States Attorneys
219 South Dearborn, 5th Floor
Chicago, Illinois 60604

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF), the GOVERNMENT'S SENTENCING MEMORANDUM, was served on July 2, 2019 pursuant to the district court's ECF system as to ECF filers.

By:     /s/ Elizabeth R. Pozolo
ELIZABETH R. POZOLO
Assistant United States Attorney
219 S. Dearborn St., Rm. 500
Chicago, Illinois 60604